[Foremans *v.* Tamm.]

## NORTHERN DISTRICT, SUNBURY, 1853.

## Foremans *versus* Tamm.

1. A free colored man can acquire a pre-emption right to land, under the law which gives that right to persons who settle on vacant land of the Commonwealth, "with a manifest intention of making it a place of abode and the means of supporting a family."

ERROR to the Court of Common Pleas of *Lycoming county.*

This was an action of *trespass vi et armis quare clausum fregit,* brought by Tamm, a colored man, against Foremans. Tamm claimed title to the *locus in quo,* by virtue of being a pre-emptor under the Act of Assembly,—that the land was the vacant land of the Commonwealth, and that he had settled on it "with a manifest intention of making it a place of abode and the means of supporting a family." Foremans defended on the ground that a colored man was not within the meaning of the Act of Assembly, and could claim no rights under it.

The Court, JORDAN, P., instructed the jury that a colored man might acquire a pre-emption right under the Act of Assembly, and a verdict was rendered for the plaintiff.

The charge of the court is the error assigned.

*Maynard* and *Youngman,* for plaintiff in error.

*J.* and *W. H. Armstrong,* for defendant in error.

The opinion of the court was delivered by

LEWIS, J.—The question in this case is whether a free colored man can acquire a pre-emption right to land, under the law which gives that right to persons who settle on vacant land of the Commonwealth, "with a manifest intention of making it a place of abode and the means of supporting a family." The court below answered the question in the affirmative.

The question has no relation to the political rights of the colored population. Whenever the white population, who settled this Commonwealth, under a charter and laws derived from a government established by a similar caste of men, and who proclaimed and maintained the independence and sovereignty under which we live, think proper to admit into political partnership either the black population of Africa or the red aborigines of America, they have a right to do so. Until this be done, the negro and the Indian must be content with the privileges extended to them, without aspiring to the exercise of the elective franchise, or to the right to become our legislators, judges and governors.

Under the Saxon government, there was a sort of people in a

[Foremans *v.* Tamm.]

condition of downright servitude, used and employed in the most servile works, and belonging, both they and their children and effects, to the lord of the soil, like the cattle or stock upon it. These seem to be those who hold the *folkland*, from which they were removable at the lord's pleasure.  On the arrival of the Normans in England, these persons seem to have been raised to an estate superior to downright slavery, but inferior to every other condition.  Their estate was called villeinage, and the tenants villeins.  They held small portions of land by way of sustaining themselves and families; but it was at the mere will of the lord, who might dispossess them whenever he pleased. The tenants were obliged to perform the meanest services for their lord, both uncertain as to the time and quantity, and were in much the same condition as the *boors* of Denmark, or the *trauls* or slaves of Sweden.  They could acquire no property, either in land or goods; but if they purchase either, the lord might enter upon them, oust the villein, and seize them to his own use, unless the latter contrived to dispose of them again before the lord had seized them; for the lord had then lost his opportunity.  The children were in the same state of bondage with their parents.  By various means, they might become enfranchised, and the good nature and benevolence of the lords of the manors having, time out of mind, permitted their villeins and their children to enjoy their possessions without interruption, in the regular course of descent; the common law, of which custom is the life, at last gave them a title to prescribe against their lords, and in the performance of the same services, to hold their lands in spite of any determination of the lord's will; and this is the origin of the copyhold tenures of England.  2 Blackstone, 92, 93, 94, 95.

This sketch of the original tenures existing in the country, from which we have derived the common law, may serve to show that, while that law has recognized the existence of slavery, it was imbued with the spirit of liberty, which enabled the slave, in process of time, to acquire his freedom of the right to purchase and hold lands and goods.  It also proves, that even in a state of very, the right of the slave to hold possession of his own acquisitions was not to be disputed by any one except his lord, and that even the lord could not dispute the title, if he delayed the seizure until after the slave had disposed of the property to another.

There is nothing in the principles of the common law, or in the former condition of the colored population, which excludes them from acquiring, in like manner, freedom and the right to purchase property, by the consent, either express or implied, of those who had heretofore held them in bondage.  The Act of Test, March, 1780, expressly declares that "all persons, negroes and mulattoes, as others born in the State, after the passing of the act,

[Foremans *v.* Tamm.]

shall be freed from the servitude occasioned by the slavery of their mothers," and that "no man or woman of any nation or color" (except negroes and mulattoes then living, who were to be registered) "shall at any time hereafter be deemed, adjudged or holden, within the territories of this Commonwealth, as slaves or servants for life, but as *free men* and *free women.*" The effect of this act of manumission is to give to the colored man the right to acquire, possess and dispose of lands and goods, as fully as the white man enjoys these rights. Having no one to look to for support but himself, it would be a mockery to tell him he is a "free man," if he be not allowed the necessary means of sustaining life. The right to the fruits of his industry and to invest them in lands or goods, or in such manner as he may deem most conducive to his comfort, is an incident to the grant of his freedom.

There is nothing in the Act of Assembly or usages of the State, in relation to pre-emption rights acquired by settlement, which excludes the colored man from acquiring title to land in this way. On the contrary, the lands owned by the State were abundant in quantity, and so long as they remained uncultivated and undisposed of, were entirely useless and unproductive of revenue to the State. But their settlement by an industrious population increased the wealth and security of the Commonwealth, and made them a source of revenue for the support of government. The policy of the Commonwealth was so manifestly in favor of the settlement of her wild lands, that emigrants from all countries were encouraged to locate themselves upon them. 2 Smith, 176, 181. More than one thousand warrants were granted to the Holland Land Company, who made numerous settlements by emigrants from Europe. Other foreign land companies were also encouraged to make settlements. For the purpose of encouraging emigrants from Wales, the usages of the Land Office were departed from, and forty thousand acres were granted to them in one warrant, in order that they might settle the land in convenient neighborhood to each other. 2 Smith, 144. Without doubt there are many titles to land held by colored people, without dispute. Within sight of the court-house in which this question was first raised, there is an island in the Susquehanna, the title to which was taken out of the Land Office by a colored man, whose right we have never heard disputed. The right to acquire land by settlement is not confined to nation or color. All persons are entitled to the privilege; and the only condition required is, that the settlement shall be made "with the manifest intention of making it a place of abode and the means of supporting a family." There was therefore no error in the instruction given by the court below on this question.

Judgment affirmed.